## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

MICHAEL LEE,

                Plaintiff,

vs.

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

                Defendant.

**Case No. 3:20-cv-3684**

**COMPLAINT**
**Jury Trial Demanded**

Plaintiff Michael Lee hereby asserts the following allegations against Defendant International Business Machines Corporation ("IBM"):

### NATURE OF THE CASE

1.      Plaintiff Michael Lee, a 30 year IBM employee was terminated in April of 2018. His termination came on the heels of his complaints to another IBM manager that IBM's decision not to pay one of his minority sales representatives sales commissions for a deal may have been a result of racial discrimination.

2.      Along with Plaintiff Lee, two other long-time IBM managers, Scott Kingston and Andre Temidis were terminated on the same day after complaining about possible discrimination of another sales representative reporting to them. Much like the sales representative reporting to Mr. Lee, the representative Mr. Kingston and Mr. Temidis were concerned about had not been paid the full commissions he had earned on two deals to the same client.

3.      That sales representative, Jerome Beard, eventually filed his own suit in Federal Court against IBM alleging among other things, that IBM had

discriminated against him by refusing to pay him his full earned sales commissions. After IBM's motion for summary judgment was denied, that case was resolved to the mutual satisfaction of the Parties prior to trial.

4.     After Mr. Lee complained about the potential discrimination of his sales representative, IBM's stated reasons for firing Mr. Lee was that he failed to ensure a reduction in the sales commission to a white representative reporting to him.

5.     This reason made no sense to Mr. Lee for two primary reasons: (1) limiting commissions to that employee would have violated IBM's written policy of uncapped sales commissions; and (2) he actually had tried to initiate a reduction at the behest of his manager, but IBM's incentives and commission department told him that would violate IBM's policies and that he could not do that.

6.     Mr. Kingston and Mr. Temidis currently have pending cases against IBM arising from their wrongful terminations as well. Mr. Kingston's case has proceeded through discovery (and has trial pending in April 2021), and the evidence could not be more clear that Mr. Lee should not have been terminated, and nearly every witness admitted as much when shown evidence that IBM had hidden from them regarding Mr. Lee's actions.

## JURISDICTION & VENUE

7.     This Court has jurisdiction over the subject matter of Mr. Lee's ADEA, Title VII, and Section 1981 claims pursuant to 29 U.S.C. § 626(b)(-(c) and 28 U.S.C. § 1337. Supplemental jurisdiction over Mr. Lee's state law claim exists under 28 U.S.C. § 1367.

8.      Venue is proper in the Northern District of Texas pursuant to 28 U.S.C.
§ 1391(b) and (c).[1]

## PARTIES

9.      Plaintiff Michael Lee is a resident of Dallas County in the State of Texas.
At the time of his wrongful termination, he was employed by IBM in Dallas County
as a NA IOT Channel Technical Executive.

10.     Defendant IBM is a corporation formed under the laws of the State of
New York with offices in this County and its headquarters in the State of New York.

## GENERAL ALLEGATIONS

11.     IBM's sales periods are in half year lengths of time, with the "First Half"
(often referred to within IBM as "1H") running from January 1 through June 30, and
the "Second Half" (often referred to within IBM as ("2H") running from July 1 through
December 31.

12.     On June 30, 2017, IBM sales representatives, led by a representative
named Nick, closed a large software licensing deal with SAS Institute Inc. ("SAS")
(the "SAS Deal"). The revenue to IBM on the deal was valued by IBM in the tens of
millions of dollars, and the commissions owed to Nick were $1.6 million.

13.     Nick was a sales representative on what is known as the "ESA Team"
which refers to a unique team of sellers at IBM that have the capability to sell any of

---

[1] Plaintiff initially filed suit on July 6, 2018 in New York (where IBM is headquartered) along with
Mr. Kingston and Mr. Temidis. Mr. Lee and Mr. Kingston's suits were dismissed under the doctrine
of *forum non conveniens* after IBM argued it was inconvenient for it to litigate in its backyard. Mr.
Lee's filing here follows an appeal where the appellate court affirmed his dismissal on the grounds of
*forum non conveniens*.

IBM's products using a particular contract vehicle known as an Embedded Solution Agreement.

14.     Nick's direct manager was Andre Temidis, and his second line manager was Scott Kingston.

15.     Nick was supported in his role by an individual named Bil S., who was, among other things, responsible for assisting Nick in whatever ways he needed to close the SAS Deal. Bil reported to Mr. Lee. Bil earned approximately $172,000 in sales commissions on the SAS Deal.

16.     Just a few short months after the SAS deal was closed, the ESA Team closed another large deal. The ESA portion of this deal, with client HCL Technologies, was sold on September 30, 2017 (the "September HCL Deal") and the revenue to IBM was approximately the same as that from the SAS Deal.

17.     The efforts to close the September HCL Deal were led by an ESA sales rep named Jerome. Jerome's first line manager was Greg Mount, and his second line manager was the same as Nick's, Scott Kingston. Mr. Mount and Mr. Temidis both reported to Mr. Kingston, and as the ESA team's territory was geographically based, Mr. Mount was responsivle for the sales reps in the western half of the country, and Mr. Temidis was responsible for the sales reps in the eastern half of the country.

18.     Similar to Nick, Jerome's efforts on the September HCL Deal led to a commission payment being owed of over $1.5 million.

19.    However, unlike Nick, Jerome was only paid $205,000. The only difference that their managers were aware of was that Nick was white and Jerome was black.

20.    When IBM made the decision to underpay Jerome, Mr. Kingston promptly questioned the reasoning, as it appeared to him and others to violate IBM's clear policies regarding sales commissions being uncapped, and seemed suggestive of racial discrimination given the $1.6 million payment to Nick in a nearly identical scenario just months prior.

21.    Jerome then closed a second deal with HCL in December 2017 ("December HCL Deal"). That deal was of a comparable size to the September HCL Deal, and earned Jerome another commission payment of approximately $1.5 million. Again, however, IBM only paid him $205,000 without explanation.

22.    Another minority sales representative wasn't paid appropriately on the HCL deals, Kami, who reported to Mr. Lee.  Kami, however, wasn't paid anything, despite the deal closing in his territory.

23.    Mr. Lee complained to Greg Mount that the disparate treatment in Kami and Bil suggested racial discrimination against Kami by IBM, since there was no other policy that accounted for the disparate treatment.

24.    Unbeknownst to Mr. Kingston, IBM launched an investigation into these commission payments. Instead of correcting the payment due to Jerome, however, IBM told Mr. Kingston and Mr. Temidis that they should have limited the

5

payment to Nick, and told Mr. Lee, that he should have limited the payment to Bil, and that all three were being fired for not initiating those reductions.

25.    These terminations made no sense to Mr. Kingston, Mr. Temidis, or Mr. Lee because what IBM claimed they should have done violated express written policies that had been communicated to them: that sales commissions at IBM were uncapped. Moreover, Mr. Lee even tried to violate that policy at the behest of his manager, and was told by IBM's Incentives and Commissions Department that he could not do that.

26.    In other words, IBM's commissions department stopped Plaintiff Lee from limiting the commission payment to Bil, yet IBM fired him for not limiting the commissions payment to Bil. That obviously makes no sense, so there has to be another reason for his termination. Which there is, retaliation by IBM against Mr. Lee for complaining to Greg Mount about IBM's possible racial discrimination against Kami.

## IBM Sales Representatives' Compensation

27.    IBM's sales representatives are generally compensated in a similar way: a base salary comprises a portion of their compensation, and commissions make up the rest.

28.    Although IBM has several primary types of commissions plans, Nick, Jerome, and Bil were all on the same type of plan: and "Individual Quota Plan" ("IQP").

29.     Sales representatives on an IQP are assigned a territory and a quota, and paid based on the percentage of the quota that they attain.

30.     IBM promises sales representatives on IQPs that sales commissions are uncapped, meaning the bigger the deal the representative closes, the more the representative can earn in sales commissions.

31.     IBM even encourages its sales representatives to close large deals in excess of their quota through the use of "accelerators." In other words, IBM provides a multiplier on quota attainment over 100%, such that sales in excess of quota enable sales representatives to earn more in commissions per dollar of sales than they would have been able to earn for each dollar of sales below 100% quota attainment.

32.     IBM communicates the uncapped nature of sales representative's commissions to its representatives in writing through PowerPoint presentations, emails, and orally through its management at sales conferences and in one-on-one meetings.

33.     Sales representatives are advised that their commissions will be paid in accordance with these promises, and will only be adjusted to correct errors in the sales representative's quota or territory.

34.     IBM reaffirms this to its managers through the following guidance:

> Conditions that may lead to an adjustment include the need to correct errors or the need to balance with employee's contribution to the success of a large sales transaction (which critera must be clearly provided to Commissions team).
>
> **Adjustments must not be done only as a ceiling or cap on the total earning allowable to employees.**

7

35.     In other words, IBM's official policies provide that sales representatives' commissions may be adjusted to correct errors, but their commissions may not be arbitrarily capped for the purpose of limiting the employee's earnings.

## IBM's Process for When Sales Representatives
## Earn Large Commissions

36.     IBM, as should be expected, has a formal process in place for when a sales representative over achieves his or her quota.

37.     In 2017, that process was called the "Achievement Out of Range" Review Process.

38.     Under that process, for sales representatives on the types of compensation plans that Nick and Jerome were on (Individual Quota Plans, or "IQPs"), if achievement by the rep was less than 150% of the sales rep's quota, only the incentive analyst in IBM's office in Brazil would review the payment prior to it being made. That review would be simply to confirm that there were no obvious errors causing the payment (such as a misplaced decimal or the like).

39.     If achievement by the representative was 150.01% to 250% of the sales representative's quota, the incentive analyst would then send the details to the sales representative's first line manager for a negative confirmation. All that means is that if the first line manager is aware of any errors in the territory or quota assignments to the rep, the manager should notify the analyst accordingly.

40.     If achievement by the representative was 250.01%-400%, both the first line and second line managers were required to provide the analyst with positive confirmation that the sales rep's territory and quota were correct.

41.     If the achievement by the sales representative exceeded 400%, in addition to the positive confirmation from the first and second line managers, the business unit vice president (usually the third line manager for the rep) was to be sent at least an informational report with the final achievement. The analyst had the option of seeking either negative or positive confirmation from the business unit vp.

42.     In this situation, the email that an analyst would send to the managers contained the following language:

> *Your role as a manager is to validate the accuracy of the territory and quota for each seller on an IQP.* ***Seller commissions for these plans are uncapped****, and are paid based on achievement results as determined by the respective territory and quotas, so it is critical to ensure this is correct.*

43.     In other words, first and second line managers' only role in the review process was to ensure that the sales representative's territory and quota were correct.

44.     Here, Nick, Jerome, and Bil all exceeded 400% of their respective quotas.

## Particulars of the SAS Deal and the HCL Deals

45.      Based on the terms of his commissions plan, Nick, the primary sales representative responsible for closing the SAS Deal, earned a sales commission in excess of $1,600,000.

46.     As a result of the SAS Deal, Nick achieved nearly 2,000% of his quota.

47.     In addition to Nick, William also exceeded his quota due to the SAS Deal, achieving nearly 600% of his quota, and was owed approximately $172,000 in sales commissions.

48.     During the course of the High Achievement Out of Range Review Process, Lee was required to review the quota, territory, and recognized revenue for Bil. During the same review process, Kingston and Temidis were required to review the same information for Nick. Each of the individuals, Lee, Kingston, and Temidis, found no errors in any of these measurement points. Accordingly, they expected both Bil and Nick to be paid in full based on three key factors: (1) there were no errors in the sales representatives' territories or quotas; (2) IBM's "no-capping" policy; and (3) the law.

49.     The "no capping" policy is a written IBM policy that states that IBM will not "cap" or otherwise limit the amount a sales representative earns in commission compensation. "No capping" means that IBM will not limit the commission amount if, for example, the commission amount exceeds a certain dollar amount. The law, of course, also requires that wages earned (including commissions) must be paid in full.

50.     Notably, Lee's, Kingston's, and Temidis's review of Bil and Nick's commissions from the SAS Deal were only one part of the process required for payment to issue. Indeed, these three managers did not even have the ultimate authority to approve the payment since Nick and Bil had achieved more than 400% of their respective quotas. As a result, Nick's commissions were, in turn, reviewed and ultimately approved by other executives higher up in the IBM sales organization.

Ultimately, the IBM Center of Excellence (IBM's term for the department in Brazil where it's incentives and commissions analysts work) has the final word on approval of specific sales commission amounts. Nick's commissions, reviewed by Kingston and Temidis and which were, or per IBM policies should have been, approved by more senior executives, were ultimately adopted and approved by the Center of Excellence and the payments issued to Nick in full.

51.    Similarly, Lee's review for the SAS Sale was reviewed by Lee's boss, Bob. Due to Bil's high achievement, Lee received an email from an analyst at the IBM Center of Excellence that informed him that: "Bob's approval is required for XaaS achievement above 150% and other achievements above 250%."

52.    Following this email, Bob told Plaintiff Lee that only a percentage of the commissions should be paid to Bil and requested that he discuss this with Mr. Kingston.

53.    Lee and Kingston were not aware of any IBM policies that permitted them to arbitrarily adjust Bil's commissions, so Lee emailed the IBM Center of Excellence regarding the matter.

54.    He received a response to his request, which informed him that IBM's policies did not permit an arbitrary adjustment of a sales representative's commissions. Specifically, Lee was told that IBM's commissions department was "not allowed to hold the payment if the customer does belong to the employee's territory and if the employee's quota is correct. If we meet the two criteria, I must release the payment in full."

11

55.     Accordingly, Mr. lee, after consultation with Mr. Temidis, confirmed that Bil's quota and territory were correct and the payment ultimately flowed in full to Bil.

56.     Later in 2017, the September HCL Deal and the December HCL Deal were closed by the ESA team. Like the SAS Deal, the HCL Deals were each worth tens of millions of dollars in revenue to IBM. Again, Kingston was involved in High Achievement Out of Range Review Process for the lead sales representative on the September HCL Deal. Following the same protocol as he had with respect to Nick on the SAS Deal, and adhering to IBM's no capping policy and the law, Kingston confirmed that the territory and quotas were correct, and expected that Jerome would be paid in full.

57.     Jerome's first line manager, Greg Mount, and Kingston, found no errors in his territory or quota and thus expected full payment of his commissions.

58.     This time around, however, the large commissions payment drew the attention and ire of IBM executives higher up in IBM's hierarchy. In particular, the Chief Financial Officer of a particular IBM unit, Brian Mulada (based at IBM's New York headquarters), decided that Jerome's commissions were simply too high. As a result, he decided that IBM would not be paying Jerome his full commissions. His determination was communicated to Kingston through another executive, Rose Nunez (also based at IBM's New York headquarters). No basis in IBM policy or law was provided to Kingston to justify this decision.

59.   In his conversation with Mr. Nunez, Mr. Kingston raised the point that IBM's decision to arbitrarily limit Jerome's commissions payments was inconsistent with the million dollar commission paid to Nick just a few months prior on a similar deal. They specifically discussed whether an error had occurred with respect to Nick's commission payment, and Ms. Nunez confirmed Nick was paid appropriately after consultation with other executives.

### Plaintiffs Raise the Issue of Discrimination and Policy Violation

60.   Kingston and Temidis were disturbed by IBM's new-found position and discussed the discriminatory treatment of Jerome in comparison to Nick on several occasions.

61.   Kingston repeatedly explained to more than one IBM executive that it would be wrong to reduce any portion of Jerome's commissions because, among other things, it would be discriminatory and it would violate the no capping policy. Kingston asked for IBM to put its position regarding Jerome's commissions in writing. IBM refused.

62.   In the fourth quarter of 2017, Kingston told IBM managers Dave Mitchell and Rose Nunez that IBM's treatment of Jerome was discriminatory. In January of 2018, Kingston told his then manager, Dorothy Copeland, that IBM's treatment of Jerome was discriminatory, and reiterated that point to Dave Mitchell and Rose Nunez again, urging IBM to reconsider its decision. IBM did not. Throughout his discussions with IBM executives he referenced the disparity in the treatment of Nick and J. As Temidis was the direct manager for Nick, and Plaintiff

13

Kingston was not actively involved in the details of the payment of Nick's commissions, it was clear in his conversations with IBM executives that he had discussed the discrimination against J with Temidis and that Temidis agreed that IBM's treatment of J was discriminatory.

63.     At the same time that IBM was deciding not to pay Jerome in full for his efforts closing the HCL Deals, another minority sales representative (Kami) under Lee was also not paid at all for the HCL Deals, despite being in his territory and quota.

64.     Kami was one of only two sales representatives that reported to Lee, along with Bil. During the same time period as Bil earned a large sales commission, Kami also earned a similar sized commission on a similar sized deal that closed in his territory. However, IBM executives told Plaintiff Lee that Kami would not be paid at all for his efforts.

65.     Plaintiff Lee raised the disparity in IBM's treatment of Bil and Kami with the executives over him, including some of the same executives that Kingston had voiced concerns regarding IBM's mistreatment of Jerome. Just like with Nick and Jerome, the only difference between Bil and Kami's commission payments was the color of their skin. Plaintiff Lee communicated to manager Greg Mount that this was potentially discriminatory treatment.

66.     Plaintiff Lee is informed and believes that the IBM executive ultimately responsible for terminating them were aware from discussions with Kingston that all three plaintiffs were discussing IBM's mistreatment of minority sales representatives

amongst themselves and that they all held the same views expressed to IBM by Kingston and Plaintiff Lee. Indeed, discovery in the Kingston case revealed that on the same days as the key meetings by the individuals involved in the termination of Lee, Kingston, and Temidis, those individuals exchanged emails regarding the particulars of the HCL Deals and Jerome's commissions payments. They did this because they were comparing Jerome's treatment to Nick's, as Lee, Kingston, and Temidis believed they should have.

### IBM Retaliates and "Investigates" Lee, Kingston, and Temidis

67.     In January 2018 IBM transferred =Kingston to a new manager. Kingston immediately explained the situation to his new manager and his view that IBM's decision would violate the policy and be discriminatory. Still, nothing changed.

68.     In January 2018, IBM advised =Kingston that it had, in fact, capped the commission payable to Jerome, withholding more than 80% of the uncapped amount of commissions he earned.

69.     In his seventeen and a half years as an IBM manager, this was the first time Mr. Kingston had one of his sales representative's commissions arbitrarily capped by IBM in conflict with IBM's written "no capping" policy. Indeed, he had never been advised of a way that he could adjust the commissions of a sales representative when there were no errors in the sales representative's quota or territory.

70.     Then, still in January of 2018, Lee, Kingston, and Temidis became aware that IBM had launched a purported "investigation." Each of them was

15

interviewed by IBM's investigator. At first, Kingston thought IBM was finally taking the complaint about discrimination seriously and investigating the issue of reducing Jerome's commission. IBM, however, had a very different agenda. The investigation was, in fact, focused on IBM's new-found contention that *Lee, Kingston, and Temidis* engaged in misconduct by not limiting the payment of commissions to white sales employees in connection with the SAS Sale that had occurred seven months earlier as described above -- commissions that multiple levels of IBM executives and its Center of Excellence approved. In short, IBM decided that the right way to cure underpayment to minority employees was not to pay them the correct amount, but to blame Lee, Kingston, and Temidis for not ensuring that IBM also paid white employees incorrectly as well.

71.     Lee, Kingston, and Temidis cooperated with the interviews. They advised the investigator of IBM's no capping policy and the names of other executive who were involved in the SAS Deal commission approvals. They did not hear anything further from IBM or the investigator.

72.     Then, on April 16, 2018 IBM executives based out of IBM's New York offices advised Lee, Kingston, and Temidis that they were being fired. The reason? Failure to reduce commissions paid to white employees on the SAS Sale. When Lee, Kingston, and Temidis protested and asked the IBM executives how they could be terminated for following IBM's written policy; how they could be terminated when they did not approve the payments or even have the authority to approve the payments, but only reviewed the specifics of the deal for accuracy; how they could be

16

terminated when multiple layers of more senior executives and the Center of Excellence approved the payments? All of their questions were met with the same response from the IBM executives: "no comment."

### Discovery in the Kingston Case

73.     Kingston filed suit in the Western District of Washington as a result of IBM's wrongful termination of him. That matter is captioned: Scott Kingston v. IBM, Case No. 2:19-cv-01488-MJP and is scheduled to begin trial on April 5, 2021.

74.     Discovery in that matter revealed many things, not the least of which was that IBM's stated reason for terminating Lee was contradicted by IBM's own policies.

75.     Moreover, it revealed that the individuals responsible for terminating Lee knew that he had been an IBM employee for over 30 years and was battling cancer and undergoing chemotherapy treatments at the time of the SAS and HCL Deals. Indeed, he was absent from work when the SAS Deal closed as he underwent surgery at the end of June 2017.

76.     Upon information and belief, the individual that replaced Lee in his position was also at least ten years younger than him.

### Jerome Sued IBM for Discrimination As a Result
### IBM's Treatment of Him on the HCL Deals

77.     After IBM's refusal to pay him the commissions that he earned from the September and December HCL Deals, Jerome filed suit against IBM.

78.     His suit was filed in the Northern District of California, and brought tort claims against IBM for its misrepresentations to him based on the no capping

policy, as well as claims for discrimination based on the disparate treatment between him and Nick. The case was captioned Jerome Beard v. IBM, Case No. 18-06783-WHA.

79.     Among other things, in denying IBM's claims for summary judgment on Plaintiff's claim of racial discrimination, the Court held that Jerome "adduced 'specific' and 'substantial' facts to show that IBM's proffered explanation reason is unworthy of credence because it is 'internally inconsistent,' or so a jury could find."

80.     The Parties resolved that litigation to their mutual satisfaction shortly after this ruling.

### FIRST CAUSE OF ACTION
### Retaliation in Violation of Public Policy
### and Texas Labor Code § 21.055

81.     Plaintiff Lee hereby incorporates by reference herein each of the allegations of the preceding paragraphs.

82.     Plaintiff Lee engaged in protected activity that gives rise to a claim against IBM for retaliation on two bases: a violation of Texas Labor Code § 21.055 and a violation of public policy.

83.     Plaintiff Lee engaged in protected activity by opposing discriminatory treatment by IBM, namely its decision to withhold the commissions of a minority employee on a deal when it paid a white sales representative commissions on a specific deal, and in the process failed to pay wages rightfully due to that minority employee.

84.     IBM was aware of this protected activity as, among other things, Plaintiff Lee raised his concerns with his superiors.

85.     Plaintiff Lee also engaged in protected activity by refusing to cap Bil's commissions after IBM's incentives and commissions department told him that he couldn't. As Bil's commissions were earned wages under Massachusetts law (where Bil resides), Plaintiff Lee would have violated the law and could have been subject to criminal penalties had he capped Bil's commissions.

86.     Thereafter, IBM took adverse action against Plaintiff Lee by terminating his employment.

87.     A causal connection exists between Plaintiff Lee's protected activity and the adverse action taken by IBM. Among other things, the purported investigation and subsequent termination of Plaintiff Lee's employment was prompted by and followed shortly after Plaintiff Lee's protected activity and the sole stated basis for terminating Lee was that he failed to limit the sales commissions to Bil.

88.     Plaintiff Lee suffered emotional distress and humiliation as a result of IBM's conduct.

89.     As a result of IBM's conduct, Plaintiff Lee has suffered and is entitled to recover damages, including lost back wages and benefits, lost future earnings and benefits, compensatory damages for emotional distress, interest, and attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF
### Violation of the Age Discrimination
### in Employment Act of 1967, 29 U.S.C. § 621, *et seq.*

90.     Plaintiff Lee hereby incorporates by reference each of the allegations of the preceding paragraphs.

91.     Within 180 days of the alleged wrongful termination of Plaintiff, Plaintiff Lee filed his claim with the EEOC and cross-filed it the same date with the Texas Workforce Commission.

92.     On or about July 19, 2020 Plaintiff received a Notice of Right to Sue from the Texas Workforce Commission.

93.     On or about September 22, 2020, Plaintiff received a Notice of Right to Sue from the EEOC.

94.     The Parties stipulated to a tolling agreement that provided among other things, that the Parties have agreed to toll the limitations period and any deadlines related to the Right to Sue Letters and that Defendant shall not argue such defenses and Plaintiff shall not argue that Defendant has waived defenses (other than time-bar defenses) because of this agreement if an action is later filed in Texas upon the resolution of the New York appeal, provided that Plaintiff filed this Action on or before December 21, 2020.

95.     At the time of Plaintiff's termination, he was over the age of 50 years old and had just celebrated over thirty years of service at IBM.

96.     IBM, and in particular, Plaintiff Lee's superiors and those who ultimately made the decision to terminate knew his approximate age and that he had been at IBM for over thirty years.

97.     He performed his job successfully during his lengthy time at IBM, and received numerous high performance reviews, including in 2017.

98.     IBM's decision to terminate him in April 2018 was at least in part motivated because of IBM's commitment to replacing older workers with younger workers.

99.     Indeed, Mr. Lee was replaced with a younger employee, who was at least 10 years younger than him.

100.    The overall circumstances of Mr. Lee's termination give rise to an inference of discrimination. To whit, not long after celebrating his thirtieth anniversary of working at IBM, Lee was "investigated" for not capping the sales commissions of a sales representative that reported to him, which would have been directly in conflict with IBM's written policies and violated the law.

101.    As a direct result of Defendant's conduct described herein, Mr. Lee has sustained and will continue to sustain wage and benefits losses, and has incurred and will continue to incur out of pocket losses, including attorneys' fees and legal costs, has lost earnings capacity, and suffered emotional distress.

### THIRD CLAIM FOR RELIEF
**Age Discrimination in Violation of**
**Chapter 21 of the Texas Labor Code**

102.     Plaintiff Lee hereby incorporates by reference each of the allegations of the preceding paragraphs.

103.    IBM's practices as set forth herein violate Chapter 21 of the Texas Labor Code prohibiting discrimination on the basis of age.

104.    IBM acted with reckless indifference to Mr. Lee's rights under Texas law to be free from age discrimination.

21

105.   As a direct result of the aforesaid employment practices, Mr. Lee has sustained and will continue to sustain wage and benefit losses, and has incurred and will continue to incur out of pocket losses, including attorneys' fees and legal costs, has lost earnings capacity, and suffered emotional distress.

### FOURTH CLAIM FOR RELIEF
**Retaliation in Violation of
Title VII of the Civil Rights Act of 1964 and
42 U.S.C. §1981**

106.   Plaintiff Lee hereby incorporates by reference each of the allegations of the preceding paragraphs.

107.   42 U.S.C. §1981 prohibits race discrimination and retaliation in the making and enforcing of contracts, including the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges and conditions of the contractual relationship.  Title VII of the Civil Rights Act of 1964 also prohibits employers from retaliating against employees for opposing discriminatory practices.

108.   In terminating Plaintiff's employment, Defendant retaliated against Plaintiff for opposing racial discrimimnation, thereby violating Title VII and 42 U.S.C. §1981.  The unlawful practices committed by Defendant were and are a direct cause of Plaintiff's damages, as more fully set forth above.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Michael Lee hereby demands a jury trial and prays for a judgment against IBM on all causes of action and for the following damages:

1.  Lost back wages and benefits in an amount to be proven at trial;

2.  Lost future earnings and benefits in an amount to be proven at trial;

3. Emotional distress damages in an amount to be proven at trial;

4. Punitive damages in an amount to be proven at trial;

5. Prejudgment interest;

6. Attorneys' fees and costs; and

7. For such other relief as the Court may deem just and proper.


Dated: December 21, 2020


Respectfully Submitted,

THE LAW OFFICES OF KELL A. SIMON
501 North IH-35, Suite 111
Austin, Texas 78702
(512) 898-9662 Telephone
(512) 368-9144 Facsimile

/s/ Kell A. Simon
Kell A. Simon
State Bar No. 24060888

Matthew E. Lee*
N.C. State Bar No. 35405
Jeremy R. Williams
N.C. State Bar No. 48162
**WHITFIELD BRYSON, LLP**
900 W. Morgan Street
Raleigh, NC 27603
Telephone:   919-600-5000
Facsimile:    919-600-5035
matt@whitfieldbryson.com
jeremy@whitfieldbryson.com


*Attorneys for Plaintiff*

*\*Pro hac vice application forthcoming*